IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 3:14-cr-81-01 |
| COREY MAYO, | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

The United States files this response in opposition to Corey Mayo's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The defendant is currently serving a 151-month sentence for conspiracy to distribute and possess with intent to distribute cocaine base. Defendant is currently in USP Atlanta, awaiting transport to USP Allenwood. He seeks early release from prison due to the threat of COVID-19 and also because he claims that he would no longer be considered a career offender under current law and has made substantial efforts at post-conviction rehabilitation. Because the defendant has already had COVID-19 and does not have a medical condition that qualifies as an "extraordinary and compelling" reason for release, and because the statutory sentencing factors in 18 U.S.C. § 3553(a) weigh against release, and because the Court has already denied a prior motion seeking a sentence reduction based on his challenges to his Career Offender designation, the Court should deny his motion.

I.      **Facts.**

A.   Procedural Posture

During the course of a several months-long investigation, law enforcement made a number of controlled buys of illegal controlled substances from the defendant and his codefendants. Specifically, during the course of the investigation, defendant sold the following

amounts of cocaine base to a cooperating individual ("CI"):  April 10, 2014 – 7 grams; April 11, 2014 – 7 grams; April 29, 2014 – 8 grams; and May 22, 2014 – 54 grams.  On May 30, 2014, law enforcement executed a search warrant at the defendant's residence and recovered 104 grams of cocaine base, a 9mm pistol, over $3,500 in cash, two cell phones, a handmade press, and a set of digital scales, among other objects.  Defendant and his coconspirators were charged in an indictment with conspiracy to distribute and possess with intent to distribute cocaine base and heroin, and with the multiple controlled buys made from the members of the conspiracy. ECF No. 10.

On October 20, 2014, the defendant pleaded guilty to the conspiracy count.  ECF Nos. 45, 47.  In support of his plea, the defendant admitted that he had conspired with others to distribute and possess with intent to distribute cocaine base over a period of three months.  ECF No. 48, ¶ 1.  Further, defendant admitted the distributions he made to the CI and his intent to distribute the 102 grams of cocaine base defendant possessed at his residence.  ECF No. 48, ¶¶ 2-6.  Furthermore, defendant admitted that during the course of and in connection with the conspiracy that he possessed a firearm.  ECF No. 48, ¶ 7.  The matter was set for sentencing on January 6, 2015.

A presentence report was prepared in advance of sentencing.  ECF No. 65 (and ECF No. 184).  Prior to sentencing, defendant filed an objection to the probation officer's finding that defendant qualified as a career offenders pursuant to U.S.S.G. § 4B1.1.  ECF No. 68. Specifically, defendant conceded that both his crime of conviction and his prior drug trafficking conviction qualified as predicates.  However, defendant challenged whether his conviction for felony discharge of a firearm in a public place qualified as a crime of violence under the residual clause of U.S.S.G. § 4B1.2(a).  ECF No. 68 at p1-3.  Defendant argued that while the state

2

statute of conviction required a willful discharge of a firearm and resulting physical injury, the crime did not have as an element the use of force against a person and was not one of the enumerated predicate offenses. ECF No. 68 at p2. Thus, defendant argued, to be a valid predicate, the publicly discharging of a firearm resulting in injury to a person must fall within the residual clause -- that is a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." USSG § 4B1.2(a). *Id.* The government, on the other hand, argued that the conviction fell within the force clause. ECF No. 167 (Transcript of Sentencing) at 5-7.

After hearing argument of counsel, the district judge found that the Virginia felony crime of willful discharge of a firearm in public causing bodily injury is a predicate crime of violence under U.S.S.C. § 4B1.2(a)(1), the force clause. ECF No. 167, at 8. The court found that the probation officer properly determined that the defendant was a career offender and that the applicable guideline range was 151 to 188 months. After hearing further argument from counsel and the statement by the defendant himself, the court sentenced the defendant to 151 months. ECF No. 167, at 14.

Following the decision in *Johnson v. United States,* 135 S.Ct. 2551 (2015), defendant filed a 2255 seeking to apply the *Johnson* holding to the determination that his prior conviction for discharge firearm in public resulting in physical injury was not a predicate crime of violence under the Career Offender guidelines. ECF Nos. 123, 130. The government moved to dismiss the motion, relying on the Supreme Court's decision in *Beckles v. United States*, __S. Ct.__, 2017 WL 855781, *3 (U.S. Mar. 6, 2017), which declined to extend *Johnson* to the advisory guidelines, holding that "the advisory Guidelines are not subject to vagueness challenges under

the Due Process Clause." ECF No. 158.  This Court agreed and dismissed defendant's 2255 motion.

      B.    <u>Requests for Compassionate Release and Medical Conditions</u>

On July 21, 2020, the defendant submitted a request for compassionate release to the Warden at FCI Edgefield.  The Warden denied the request on September 28, 2020.  Defendant was not considered by the Bureau of Prisons for home confinement under the CARES Act because at the time of the request, defendant was a Medium security inmate and has a PATTERN score of high risk recidivism level.  Since that review, defendant's status has been elevated to High Security inmate. *See below*, C. Disciplinary Infractions and Institutional Transfer.

On October 13, 2020, defendant filed a pro se Compassionate Release motion with this Court arguing for release based on the spread of COVID-19 and also arguing that he would no longer be a career offender if sentenced today.  ECF No. 179.  Defendant also sought representation of counsel.

On November 13, 2020, defendant filed a supplemental brief in support of his motion claiming that he has high blood pressure, a heart murmur and had recently fainted in his cell.  Defendant further alleged that FCI Edgefield was not following proper CDC guidelines and that that inmates and staff were failing to properly wear masks and socially distance.  ECF No. 181.  Defendant again supplemented his motion with an affidavit.  ECF No. 182.  On January 4, 2021, defendant supplemented his motion by raising the recent decision in *United States v. McCoy,* 2020 WL 7050097 (4th Cir. Dec. 2, 2020).  ECF No. 188.  Defendant again supplemented his motion on February 2, 2021, informing the Court that an inmate at Edgefield had died and also that the defendant had contracted COVID-19 on December 29, 2020.  ECF No. 189.  On

February 8, 2021, defendant, through counsel, filed a fully briefed motion for Compassionate Release.

Although defendant claims that he has developed asthma as a result of contracting COVID-19 in late December 2020, defendant's medical records show that defendant claimed at a doctor's appointment on October 2, 2020 that he was having a hard time breathing for the last 4 to 5 months, which preceded his contracting COVID-19. Exhibit 1 (filed under seal) at 3 of 23.[1] The examining medical provider noted that although the defendant was complaining of problems breathing at the time of the appointment, the defendant did not appear to be in any distress, his vital signs were stable, and he was speaking normally. *Id.* His blood oxygen saturation was at 99 percent. *Id.* Further the defendant had no reported history of asthma or the use of an inhaler. *Id.*

Defendant now claims a history of bronchitis as a child and that he used an inhaler. However, defendant's presentence report is devoid of any such history for the defendant (although the defendant did report that his son has bronchitis). ECF No. 184, ¶ 94. Notably, at his October 2, 2020 medical appointment, defendant did report some depression due to COVID-19 and watching CNN all the time. Exhibit 1 at p 3 of 23.

On November 2, 2020, defendant was found unresponsive in his cell lying in a puddle of water. ECF No. 190-1 at pp. 6-7. He had pinpoint pupils, had respiratory depression and cyanosis (lips and skin turning blue from lack of circulation). *Id.* He was taken to medical in handcuffs and slouched in a wheelchair. *Id.* at p.7. Defendant was administered Narcan Nasal Spray and was revived. *Id.* Defendant's symptoms and response to Narcan are consistent with

---

[1] Notably, defendant did not include the record of this appointment in his medical records exhibit to his motion.

an opioid overdose.  *See* http://www.americanaddictioncenters.org Symptoms of Opiate Overdose, last updated February 12, 2021.  However, no drug test was taken.

On December 28, 2020, defendant tested positive for COVID-19.  ECF No. 189.

C.  Disciplinary Infractions and Institutional Transfer

At the time that defendant filed his original motions for compassionate release he was at FCI Edgefield.  However, he is currently at USP Atlanta as a holdover inmate (USP Atlanta is one of the Bureau of Prisons' "hubs" for transfers).  Defendant is in the process of being transferred to USP Allenwood.  Due to his recent disciplinary infractions, defendant is now a High security inmate and needed a higher security level institution than FCI Edgefield.  His recent serious disciplinary infractions are most likely the reason for the transfer - engaging in a sexual act on February 21, 2021 and disruptive conduct-greatest on October 23, 2020.  Exhibit 2, attached.  In addition to these most recent serious disciplinary infractions, defendant also had multiple infractions for fighting on April 29, 2017, February 1, 2017 and May 4, 2016.  Exhibit 2.

D.  Proposed Release Plan

If released, defendant plans to reside with his mother at her home in Richmond, along with his maternal half-sister and his 10-year old son.  He also plans to work in a restaurant.

## II.    BOP efforts to mitigate the effects of COVID-19.

Since the onset of the COVID-19 pandemic, BOP has adopted measures to contain the spread of the virus within prisons.  In appropriate cases, BOP has released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[2]

---

[2] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

BOP has also begun vaccinating inmates and staff.  Further, BOP has limited access to prisons, restricted prisoner movement within prisons, required screening and testing, provided masks and hand cleaners, separated ill inmates from the rest of the population, and educated inmates and staff on preventing the spread of disease.

Before Congress enacted the CARES Act, § 3624(c)(2) authorized BOP to "place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  As part of the CARES Act, Congress sought to address the spread of COVID-19 in prisons by temporarily authorizing BOP to expand the use of home confinement under § 3624(c)(2).  Accordingly, during the coronavirus emergency, the Act suspends the limitation that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, provided that the Attorney General finds that "emergency conditions will materially affect the functioning" of BOP.[3]  CARES Act § 12003(b)(2).  The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.  Memorandum from Attorney General to BOP Director (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

BOP has been "reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention ("CDC"), to determine which inmates are suitable for home confinement."  *COVID-19 Home Confinement Information*, BOP, https://www.bop.gov/coronavirus/ (last visited 5/26/2021).  There are currently 7,128 inmates on

---

[3] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

home confinement, and the BOP has placed a total of 25,890 inmates in home confinement since March 26, 2020. *Id.*

Inmates do not have to apply to be considered for home confinement. BOP considers such factors as the "age and vulnerability of the inmate to COVID-19," consistent with CDC guidelines; the security level of the inmate's facility, giving priority to those in low and minimum security facilities; the inmate's conduct while in prison; whether the inmate has a release plan "that will prevent recidivism and maximize public safety"; and the "danger posed by the inmate to the community." Memorandum from Attorney General to BOP Director 1–2 (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. Additionally, BOP must assess the inmate's risk factors and grant home confinement only after determining that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." *Id.* at 2. To protect the public against further spread of the coronavirus, BOP requires every inmate granted home confinement to quarantine for 14 days before his release. *Id.*

BOP has also begun administering vaccines to inmates and staff. As of May 26, 2021 BOP has administered a total of 180,635 doses of the COVID-19 vaccine. *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus/. After offering the vaccine to all employees, institutions give priority to inmates assigned to work in health service units and inmates in nursing care centers or other residential care units. *COVID-19 Vaccine Guidance*, BOP 6 (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Next, priority is given to inmates age 65 or older and inmates of any age who, based on CDC criteria, "are at increased risk" for severe illness from COVID-19 due to one or more medical conditions. *Id.* The third level of priority for vaccine administration includes inmates between 50 and 64

years old and inmates of any age who, based on CDC criteria, "might be at increased risk" for severe illness from COVID-19 due to one or more medical conditions. *Id.* at 7.  Vaccines will then be available to all other inmates. *Id.*

BOP is also operating under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use, particularly when it is not possible to social distance. *Correcting Myths and Misinformation About BOP and COVID-19*, BOP (May 6, 2020), https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.  Common areas are sanitized multiple times per day. *Id.* at 3.  Additionally, medical staff screen every newly admitted inmate for COVID-19. *BOP Modified Operations*, BOP (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.  Inmates who are asymptomatic and test negative are placed in quarantine for 14 days. *Id.*  Inmates who are symptomatic and/or test positive are placed in medical isolation. *Id.*

Medical staff also conduct rounds and check inmate temperatures at least daily. *Correcting Myths and Misinformation About BOP and COVID-19*, at 1.  Inmate movements are "limited" to "prevent congregate gathering and maximize social distancing," with movement "in small numbers" permitted to access the commissary, laundry, showers, and phones. *BOP Modified Operations*.  Movement is also still permitted for mental health and medical care. *Id.*

Inmates who are transferring between facilities, moving to other correctional jurisdictions, or being released from BOP custody must quarantine for 14 days and test negative before transfer. *Id.*  BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary." *Id.*  For immediate releases where the inmate could not

quarantine for 14 days, BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary. *Id.*

BOP also conducts temperature checks and COVID-19 screening for staff, contractors, and other visitors to its facilities. *Id.* Anyone who registers a temperature of 100.4 degrees Fahrenheit or higher cannot enter the building. *Id.* Staff who exhibit symptoms are sent home. *Correcting Myths and Misinformation About BOP and COVID-19*, at 3.

BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space. *BOP Modified Operations*. Visits are "non-contact" and must be socially distant, either using physical barriers such as plexiglass or physical distancing. *Id.* Inmates in quarantine or isolation cannot participate in visits. *Id.* Visitors must submit to symptom screening and a temperature check before entering a facility; those who are sick or symptomatic are denied entry. *Id.* Both the inmate and the visitor must wear facial coverings at all times and must perform hand hygiene before and after the visit. *Id.*

Volunteer visits and tours have been suspended. *Id.* Contractors may access BOP facilities to perform "essential services, religious worship services, or necessary maintenance on essential systems," but must complete a COVID-19 screening and temperature check before entry. *Id.*

Additionally, BOP has published extensive guidance to all staff and established a 24/7 hotline to answer staff questions about the virus. *Correcting Myths and Misinformation About BOP and COVID-19*, at 2.

**III.     Conditions at the defendant's facility.**

The defendant is currently serving his sentence at USP Atlanta, awaiting transfer to USP

Allenwood, a high security facility in Pennsylvania.  He has served 7 years, or about 64 percent

of his sentence, taking into account credit for time served and good conduct time earned, and his

projected release date is July 1, 2025.[4]

USP Atlanta has a total of 1947 inmates.  As of May 26, 2021, 0 inmates at USP Atlanta

are positive for COVID-19.  USP Allenwood has a total of 510 inmates.  As of May 26, 2021, 0

inmates at USP Allenwood are positive for COVID-19.

On December 28, 2020, defendant tested positive for COVID-19.  Exhibit 3 (under seal)

at p 13. While defendant did have a headache, body aches and other minor symptoms,

defendant's medical records show no serious symptoms, including no fever.  Exhibit 3 (under

seal) at pp 13-14.  Furthermore, defendant's vitals, including his saturated blood oxygen levels

("SaO2") were all normal.  Exhibit 3 (under seal) at pp 2, 7, 13-14, 39-42.  The only residual

complaint was shortness of breath.  Exhibit 3 (under seal) at pp 2, 6-7.  However, as noted in

defendant's medical records, defendant complained of shortness of breath in October 2020,

months before he contracted COVID-19.  Exhibit 3 (under seal) at p7.  Furthermore, defendant's

chest X-rays were normal.  Exhibit 3 (under seal) at p11.  On the other hand, defendant was

diagnosed with anxiety, which could account for his perceived shortness of breath, particularly in

light of his high SaO2 levels.  Exhibit 3 (under seal) at p3.

Consistent with CDC guidance, the BOP has begun administering vaccines to inmates

and staff at USP Atlanta and USP Allenwood.  As of May 26, 2021, 690 inmates and 218 staff at

---

[4] Defendant lost an additional 68 days of good conduct time based on his two most recent
disciplinary infractions.  *See* Exhibit 2.

USP Atlanta and 1163 inmates and 411 staff at USP Allenwood have received both doses of the COVID-19 vaccine.  *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus.

On March 11, 2021, defendant was offered the COVID-19 Pfizer-BioNTech vaccine but refused it.  Exhibit 4 (under seal) at p23.

## Argument

**IV.   The Court should deny the defendant's motion because he has not established an extraordinary and compelling reason for compassionate release.**

The defendant has not established that this Court should exercise its discretion under § 3582(c)(1)(A)(i) to grant compassionate release because he has already contracted COVID-19 with only minor symptoms, he refused the vaccine, and he has not established a particularized risk of contracting COVID-19 at his facility.[5]

Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction."  Although the statute "does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release," the Sentencing Commission has "addressed the issue in a policy statement." *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  According to the policy statement, "extraordinary and compelling reasons" may exist based on the defendant's medical condition, age, family circumstances, or other reasons as determined by BOP.  U.S.S.G. § 1B1.13.  If a district court finds that extraordinary and compelling reasons exist, the court may not reduce a

---

[5] The defendant properly exhausted his administrative remedies by filing a request for compassionate release with the warden of FCI Edgefield on July 21, 2020.  The warden denied that request on September 28, 2020.

sentence before "considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable." § 3582(c)(1)(A). The defendant bears the burden of proving that he is entitled to relief under § 3582(c)(1)(A). *United States v. Weaver*, No. 1:17-CR-235, 2020 WL 4810123, at *2 (E.D. Va. Aug. 18, 2020); *see United States v. Morgan*, 473 F. Supp. 3d 544, 547 (D.S.C. 2020); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).

The Fourth Circuit's recent decision in *McCoy* does not reduce the defendant's burden of establishing an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A). In *McCoy*, the court held that the policy statement in U.S.S.G. § 1B1.13 is not "applicable" to compassionate release motions brought by defendants under § 3582(c)(1)(A). 981 F.3d at 281–82. Because § 1B1.13 "was adopted before the First Step Act" and specifically mentions only motions brought by BOP, the court reasoned that the policy statement does not apply to motions brought by defendants. *Id.* at 282. Absent an applicable policy statement, district courts should "make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language." *Id.* at 284. The Fourth Circuit noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id.* at 282 n.7 (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (observing that "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'" and that "a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused," such that the policy statement "can guide discretion without being conclusive")). Accordingly, the Fourth Circuit has continued to reference § 1B1.13 as a guidepost for compassionate release motions even after *McCoy*. *See, e.g.*, *United States v. Trotman*, No. 20-6217, 2020 WL 7392287, at *2 (4th Cir. Dec. 17, 2020)

(per curiam); *United States v. Adamson*, 831 F. App'x 82, 83 (4th Cir. 2020) (per curiam). Courts in this district have followed suit. *See, e.g.*, *United States v. Nabaya*, No. 3:17cr3, 2021 WL 54361, at *6 (E.D. Va. Jan. 6, 2021); *United States v. Prater*, No. 3:13cr133 (DJN), 2021 WL 54364, at *3 (E.D. Va. Jan. 6, 2021); *Perkins v. United States*, No. 2:18-cr-177, 2020 WL 7364222, at *2 (E.D. Va. Dec. 15, 2020); *United States v. Reid*, No. 2:02cr172-7, 2020 WL 7318266, at *2 (E.D. Va. Dec. 10, 2020).

After *McCoy*, defendants still must "meet the heightened standard of 'extraordinary and compelling' reasons [to] obtain relief" under the statute. *McCoy*, 981 F.3d at 287; *see also Gunn*, 980 F.3d at 1180 ("The statute itself sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner" under § 3582(c)(1)(A)(i).). The Fourth Circuit's decision maintains that § 3582(c)(1)(A)(i) "set[s] an exceptionally high standard for relief" and that the "extraordinary and compelling reasons" standard is reserved for "the truly exceptional cases." *McCoy*, 981 F.3d at 287-88.

Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for compassionate release. *See, e.g.*, *United States v. Thompson*, No. 20-40381, 2021 WL 37493, at *3 (5th Cir. Jan. 5, 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release . . . ."); *see United States v. Miller*, No. 3:16cr121, 2020 WL 4547809, at *5 (E.D. Va. Aug. 6, 2020) (Defendant "cannot rely merely on a fear of contracting COVID-19 as grounds for compassionate release." (internal quotation marks omitted)); *United States v. Day*, 474 F. Supp. 3d 790, 805 (E.D. Va. 2020) ("[W]hile the global health crisis is no doubt extraordinary, it affects all prisoners; and the risk of being infected by COVID-19, standing

14

alone, fails to justify an inmate's compassionate release."); *Feiling*, 453 F. Supp. 3d at 842

("[T]he threat of COVID-19 exists both in- and outside of prison walls, and Defendant's fear of

contracting COVID-19 cannot justify his release.").  "Indeed, a general fear of contracting

COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and

compelling reason for a defendant's release." *United States v. Chandler*, No. 3:15mj122( (DJN),

2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020); *see also United States v. Evans*, No.

3:00cr63, 2020 WL 5121331, at *5 (E.D. Va. Aug. 31, 2020) ("[A] 'fear' of contracting COVID-

19[] … will not suffice as an 'extraordinary and compelling' reason for sentence reduction under

18 U.S.C. § 3582(c)(1)(A).").  Instead, "[i]n the context of the COVID-19 outbreak, courts have

found extraordinary and compelling reasons for compassionate release when an inmate shows

both a particularized susceptibility to the disease and a particularized risk of contracting the

disease at his prison facility." *Adamson*, 831 F. App'x at 83 (quoting *Feiling*, 453 F. Supp. 3d at

841); *see United States v. Blevins*, No. 20-7053, 2020 WL 7691726, at *1 (4th Cir. Dec. 28,

2020) (per curiam).

      In this case, the defendant has not met the "heightened standard" of demonstrating an

"extraordinary and compelling" reason for relief.  Therefore, the Court should deny his motion

for compassionate release.

### A.     The defendant has not demonstrated that he faces a particularized susceptibility to COVID-19.

      The defendant has not established an extraordinary and compelling reason for

compassionate release because he has not shown that he faces a "particularized susceptibility" to

COVID-19.  *Adamson*, 831 F. App'x at 83.  He asserts that his high blood pressure, testing

positive for COVID-19 and his anxiety place him at risk of developing severe symptoms if he

contracts the coronavirus.  Because he already contracted COVID-19, had mild symptoms and

recovered, defendant has not established that he is entitled to relief under § 3582(c)(1)(A).

The CDC has recognized that the "[r]isk for severe illness with COVID-19 increases with age, with older adults [being] at highest risk." *Older Adults*, CDC (Dec. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. However, the defendant is only 31 years old, which by itself, does not "create a materially elevated risk of hospitalization or death due to COVID-19." *United States v. Lumpkin*, No. 2:12cr192, 2020 WL 7123109, at *2 (E.D. Va. Dec. 4, 2020) (43-year-old defendant was not particularly susceptible to COVID-19); *see also, e.g.*, *United States v. Dunlap*, No. PJM 01-97, 2020 WL 5096723, at*4 (D. Md. Aug. 28, 2020) ("[W]hile the Court recognizes that risk for severe illness from COVID-19 increases as one ages, being 55 by itself is not an 'extraordinary and compelling reason' for release."). In this case, the defendant, has not established that his age puts him at increased risk for severe illness from COVID-19.

"To establish a particularized susceptibility to COVID-19, courts have required defendants to provide evidence that they suffer from a medical condition identified by the [CDC] as a COVID-19 risk factor." *Chandler*, 2020 WL 6139945, at *5. The defendant asserts that he suffers from high blood pressure. However, defendant's high blood pressure is adequately controlled with medication. Where the defendant is receiving medical treatment to manage his hypertension, courts have found that this condition does not establish a particularized susceptibility to COVID-19. *See, e.g.*, *Reid*, 2020 WL 7318266, at *2; *Barrett v. United States*, No. 4:15-cr-47-1, 2020 WL 6206008, at *3 (E.D. Va. Oct. 22, 2020). Further defendant's high blood pressure did not actually result in defendant having any severe symptoms of COVID-19 when he contracted it in December, 2020.

16

The fact that the defendant previously contracted COVID-19 does not establish "that he suffers a particularized susceptibility to reinfection of the disease or harm therefrom." *United States v. Nabaya*, No. 3:17cr3, 2021 WL 54361, at *5 (E.D. Va. Jan. 6, 2021). Defendant contracted the virus in December, had mild symptoms, and recovered. Although defendant claims to have residual effects from the virus, his medical records do not support that claim. To the contrary, the records show that he has fully recovered from COVID-19 and that the breathing issue about which he continues to complain, existed prior to his contracting COVID-19. Additionally, defendant's numerous medical examinations, tests and his vital signs, which were all within normal limits, indicate defendant's "shortness of breath" (or "SOB") is more likely a result of his anxiety rather than a medical condition associated with COVID-19. Thus, "[t]he immediate threat serving as the basis for Defendant's requested release—the risk of Defendant contracting COVID-19 and becoming seriously ill—has passed." *United States v. Hartley*, No. 5:13-CR-46-KDB-DSC-1, 2020 WL 4926146, at *3 (W.D.N.C. Aug. 21, 2020). Further, courts have held that "[r]ecovery from a positive COVID-19 diagnosis, particularly where the inmate suffered only minor symptoms, is not enough to show that extraordinary and compelling circumstances warrant" his release. *Id.*; *see Holloman*, 2020 WL 5913994, at *4 (finding no particularized susceptibility where the defendant had "tested positive for asymptomatic COVID-19 in early June 2020, which was resolved in July 2020"). Indeed, the fact that the defendant "appears to have recovered from the virus without any serious complications," *Nabaya*, 2021 WL 54361, at *5, illustrates that BOP has successfully managed his treatment to date. *See, e.g.*, *United States v. Ferguson*, No. 5:15-CR-18-KDB-DSC-1, 2020 WL 5300874, at *5 (W.D.N.C. Sept. 4, 2020) ("The fact that the medical staff at [the defendant's facility] were able to successfully treat [him] for COVID-19, despite his DVT [deep vein thrombosis] and blood

disorder, serves as the best evidence that they are well-suited to treat him again even if it is possible that he could get re-infected.").  Nor do the "lingering effects of COVID-19[] … rise to the level of an 'extraordinary and compelling' reason justifying compassionate release."  *United States v. Lumpkin*, No. 2:12cr192, 2020 WL 7123109, at *2 (E.D. Va. Dec. 4, 2020).  Finally, the possibility that the defendant may be re-infected with the virus does not constitute an extraordinary and compelling reason for compassionate release.  *Hartley*, 2020 WL 4926146, at *4.

      **B.**    **The defendant has not demonstrated that he faces a particularized risk of contracting COVID-19 at USP Atlanta or USP Allenwood.**

The defendant is not entitled to compassionate release under § 3582(c)(1)(A) because he has not established a "particularized risk of contracting the disease at his prison facility."  *Adamson*, 831 F. App'x at 83.  The defendant suffers from high blood pressure.  According to the CDC, individuals with high blood pressure "are at increased risk of severe illness" from COVID-19.  *See People with Certain Medical Conditions*, CDC (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.  Further, the defendant has not yet received the COVID-19 vaccine because he refused it.

In light of the COVID-19 pandemic, high blood pressure qualifies as "a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).]  However, defendant's prior experience with COVID-19 established that while he was at an increased risk, he did not in fact have serious symptoms and did in fact recover.

Even if the Court determines that the defendant suffers from a medical condition that makes him particularly susceptible to COVID-19, he has not established an "extraordinary and compelling" reason for compassionate release because he has not shown any "particularized risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83; *see, e.g.*, *United States v. Evans*, No. 3:00cr63, 2020 WL 5121331, at *4-*5 (E.D. Va. Aug. 31, 2020) (finding that the defendant's underlying medical conditions were "extraordinary and compelling" but that she did not face a particularized risk of contracting COVID-19 at her facility).

Courts have required that a defendant's particularized risk "be supported by evidence of an actual outbreak in his facility, not simply the mere possibility of COVID-19 spreading to his camp." *United States v. Little*, No. 1:10-cr-135, 2020 WL 3442173, at *2 (E.D.Va. June 23, 2020); *see also, e.g.*, *Beahm*, 2020 WL 4514590, at *2. The defendant asserts that he has been unable to get sufficient medical attention and that his requests for medical attention have gone unanswered. Defendant's medical records belie this claim. Defendant had more than a dozen medical visits since October 2020. Recently, defendant failed to attend his requested medical appointments. Defendant's medical records demonstrate that defendant has not been deprived medical services as he alleged.

USP Atlanta, where defendant is currently, has a total of 1947 inmates. As of May 26, 2021, there are no inmates who are positive for COVID-19. To date, 690 inmates are fully vaccinated. USP Allenwood has 510 inmates, none of whom are positive for COVID-19. To date, 1163 inmates are fully vaccinated.

These figures illustrate that the number of COVID-19 cases at these facilities "has steadily declined since Defendant filed his motion." *Day*, 474 F. Supp. 3d. In other words, the

"situation" at these facilities "is improving, not deteriorating," and the defendant cannot "allege a 'particularized risk' of contracting COVID-19 at this time." *Id.*

Moreover, the defendant has not established any "inadequacies" relating to USP Atlanta or USP Allenwood's "protocols," much less "how those inadequacies jeopardize his health." *United States v. Bryant*, No. 4:19cr47-10(DJN), 2020 WL 7497805, at \*5 (E.D. Va. Dec. 21, 2020). These facilities continue to follow BOP's modified operations plan during the COVID-19 emergency. In addition to BOP's standard protocols, the defendant's facility is taking additional precautions, including regular testing, limited visitation and requirements for visitors to minimize the transmittal of COVID-19, temperature checks, and evaluations of inmates for symptoms. These mitigation efforts reinforce that the defendant does not face a particularized risk at his facility. *See, e.g.*, *Beahm*, 2020 WL 4514590, at \*2 (noting BOP efforts to contain the spread of COVID-19, including "limiting access to prisons, restricting prisoner movements within prisons, using screening and testing, educating inmates and staff on preventing the spread of disease, providing masks and hand cleaners, and separating ill inmates").

On March 11, 2021, BOP offered to administer the vaccine to the defendant, who refused it. The defendant cannot establish a particularized risk of contracting COVID-19 where he refuses to "tak[e] the reasonable precautions afforded to him by the BOP." *United States v. Feiling*, No. 3:19cr112(DJN), 2020 WL 5047064, at \*7 (E.D. Va. Aug. 26, 2020) (finding that, although the defendant suffered from several COVID-19 risk factors, he had not established extraordinary and compelling reasons for compassionate release because he refused BOP's offer to place him in medical isolation in order to preserve his housing assignment). Otherwise, it "would encourage inmates to avoid" precautions "that will help reduce the spread of COVID-19 within the prison system in hopes that a court will find them at risk and release them, defeating

the ultimate goal of both the BOP and the courts in helping stem the spread of COVID-19." *Id.* Further, the defendant's decision to refuse the vaccine "undermines his argument" that the BOP "has not taken sufficient steps to protect him from contracting COVID-19," given that BOP officials allocated doses of the vaccine for the defendant in order to protect him against the risk of future infection. *Id.*

Further, the defendant's current incarceration does not present a particularized risk of contracting COVID-19 because his release plan does not show that he is less likely to contract COVID-19 outside the BOP.  If released, the defendant plans to live with his mother in Richmond, Virginia.  Richmond currently has 131 positive cases of COVID-19.  Compared with 0 active cases at USP Atlanta and USP Allenwood, Richmond does not present a lower risk to the defendant of contracting COVID-19.  *See United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *2 (E.D. Va. Dec. 11, 2020) (finding that the defendant's release plan did not lower his risk of infection where "he would be living in a county with a significant number of positive COVID-19 cases"); *United States v. Lloyd*, No. 2:11cr36, 2020 WL 4501811, at *4 (E.D. Va. Aug. 5, 2020) (denying compassionate release where the "Defendant's proposed release plan involve[d] living with a family member just outside of Atlanta, Georgia, an area that has recently experienced a surge in COVID-19 cases"); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) (finding it was "not clear" that the defendant "would be safer from the virus on home confinement" where "the number of cases in Richmond, Virginia—where Defendant would be released on home confinement—far exceed[ed] the number of cases in Petersburg, Virginia").]

The defendant's release plan "would not necessarily be any safer for him because he would be released to a home that does not follow the strict procedures laid out in the BOP's

modified operations plan." *Watson*, 2020 WL 7318269, at \*2; *see Feiling*, 453 F. Supp. 3d at 842 ("[A]lthough Defendant argues that home confinement would allow him to better mitigate his exposure to COVID-19, the same can be said of keeping Defendant in prison, where the BOP has already taken steps to isolate prison facilities from internal and external sources of the coronavirus.").  Additionally, releasing the defendant "might expose others to the dangers of COVID-19 because he would need to interact with his family, his probation officer, and other members of the community." *Id.*  Thus, releasing the defendant to live with his mother, sister and son "would presumably compound the risks" to their health by requiring them "to go out into society and interact with others to obtain necessities." *Feiling*, 453 F. Supp. 3d at 842; *see also, e.g.*, *White*, 2020 WL 3442171, at \*6 (observing that the defendant's release plan would impose risks on his "77-year-old mother, who [] offered to house him upon his release despite her own medical problems").]

Additionally, the defendant's medical records indicate that he has been receiving treatment for his high blood pressure and his anxiety while at USP Atlanta.  The defendant has made no showing that he would continue receiving the requisite care if released.

Because the defendant has not established a particularized risk of contracting COVID-19 at his facility, he is not entitled to compassionate release under § 3582(c)(1)(A).

## V.   The Court should deny the defendant's motion because the statutory sentencing factors do not support release.

Even if the Court determines that the defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny the defendant's motion because the statutory sentencing factors weigh against release.  Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence. Those factors include "the nature and circumstances of the underlying offense and the history

and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant." *Prater*, 2021 WL 54364, at *4 (citing 18 U.S.C. § 3553(a)(1)–(2)). Section 3553(a) also instructs courts to "consider the kinds of sentences available and the sentencing range established for the offense." *Nabaya*, 2021 WL 54361, at *4 (quoting 18 U.S.C. § 3553(a)(4)). Further, the Sentencing Commission policy statement, U.S.S.G. § 1B1.13, instructs courts to consider the factors set forth in 18 U.S.C. § 3142(g), including "the nature and circumstances of the offense charged …; the history and characteristics of the person …; [and] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* (quoting 18 U.S.C. § 3142(g)). Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." *Prater*, 2021 WL 54364, at *4 (citing U.S.S.G. § 1B1.13, application note 3). In this case, the relevant statutory sentencing factors do not support compassionate release.

The seriousness of the defendant's offense weighs heavily against release. Courts in this district consistently have denied compassionate release based on the seriousness of the defendant's offense. *Reid*, 2020 WL 7318266, at *3 (finding that the statutory sentencing factors weighed against release where the defendant had "served as a 'manager' in a vast drug-trafficking conspiracy" and "continued his wrongful conduct even after his arrest by directing a co-conspirator to collect drug proceeds"); *see also, e.g.*, *Prater*, 2021 WL 54364, at *6 (finding that a defendant convicted of drug and firearm-related offenses had "proved his willingness to deal drugs on a large scale and to use violence in furtherance of that drug-dealing activity"); *Albury v. United States*, No. 2:19-cr-68, 2020 WL 6779643, at *5 (E.D. Va. Oct. 23, 2020)

(finding that the statutory sentencing factors weighed against release where the defendant "was convicted of a large-scale drug trafficking crime that he conducted over the course of five years," "possessed firearms," and "often travelled interstate to purchase and sell drugs"). Defendant was an armed, ounce-level crack dealer. Notably, the facts supported two separate charges of possession with intent to distribute more than 28 grams of crack cocaine, charges that would have triggered the minimum mandatory term of 5 years' imprisonment and the higher maximum of 40 years' imprisonment. ECF No. 184, ¶¶ 27, 30-31, 38. If defendant had pleaded to the higher charge, he would have faced a considerably higher advisory guideline range under the career offender provisions. *See* U.S.S.G. § 4B1.1. The facts also would have supported a charge and conviction for possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c), which would have resulted in an even greater guideline range. ECF No. 184, ¶ 38.

The defendant's criminal history underscores that the statutory sentencing factors do not support his request for release. Defendant presents a "serious" risk of recidivism given that he committed this offense after having served a year in prison and with 19 years of suspended penitentiary time hanging over his head. *Prater*, 2021 WL 54364, at *6; *see also, e.g.*, *Bryant*, 2020 WL 7497805, at *6 (reasoning that the defendant "present[ed] a recidivism risk, as evidenced by the fact that he violated the conditions of his pretrial release and consistently failed to comply with drug testing requirements"); *United States v. Booth*, No. 3:15cr56, 2020 WL 6361935, at *4 (E.D. Va. Oct. 29, 2020) (finding that the defendant "present[ed] a danger both to himself and the community" because he had several prior larceny convictions at the time he committed the underlying offense); *Chandler*, 2020 WL 6139945, at *6 (finding that the § 3553(a) factors did not support release where the defendant had an "extensive criminal history,

24

which started at age 15" and included "multiple theft-related offenses" and "several violent offenses"). Moreover, the defendant's crimes have become increasingly serious over time. *See, e.g.*, *Doyle*, 2020 WL 4590517, at *7 (denying compassionate release where the defendant's "criminal history reflect[ed] an escalation in the seriousness of his criminal behavior, ranging from an early conviction for distribution of marijuana to the instant conspiracy to commit robbery"). Defendant's criminal history consists of multiple firearm and drug adult convictions starting in 2011 through and including the instant offense which started in February 2014. Defendant committed the instant offenses while defendant was serving probation on two drug trafficking felonies, a concealed weapons felony and a felony willfully discharge a firearm in public causing bodily injury.

In spite of lenient treatment and nearly 20 years of suspended penitentiary time, defendant was not deterred from engaging in armed drug trafficking. Indeed, defendant's current 151 month sentence has not deterred him from breaking institutional rules in serious ways.

Compassionate release is not appropriate because the defendant presents a danger to the safety of others and the community. *See* 18 U.S.C. § 3142(g). The defendant "presents a serious threat to the public" because he qualifies as a career offender based on prior convictions for drug trafficking and willful discharge of a firearm causing bodily injury. *United States v. Harris*, No. 3:11cr156, 2020 WL 7646633, at *5 (E.D. Va. Dec. 23, 2020). Further, the defendant "has more than one offense involving firearms, which raises concerns about public safety should he be released." *Harris*, 2020 WL 7646633, at *5; *see also, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 ("Defendant was also attributed with a firearm at sentencing, a fact that further underscore[d] the seriousness of his criminal conduct."). When looked at in detail, defendant's prior convictions reveal a street thug, who was regularly armed, sold drugs, and did not hesitate to shoot.

25

The defendant's "continued disregard for the law shows that he presents a danger to the community and should not be immediately released." *Nabaya*, 2021 WL 54361, at *6 (denying compassionate release where the defendant "claim[ed] sovereign citizenship and generally defie[d] Court orders and the rule of law"); *Albury*, 2020 WL 6779643, at *5 (denying compassionate release based on defendant's "demonstrated history of not only disobeying court rules but also of committing more crimes during his supervised release"). Defendant's criminal history demonstrates that he committed multiple firearm and drug offenses while on probation for other drug or firearm offenses, including the instant offense. "The need for continued deterrence of such misconduct weighs against" the defendant's request for compassionate release. *Nabaya*, 2021 WL 54361, at *6.

The defendant asserts that he has made significant progress and rehabilitation through his current prison term. Specifically, defendant claims that he has completed multiple educational and vocational programs. To be sure, defendant's rehabilitative efforts are commendable. However, "Congress made clear that '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason'" for release. *Hill*, 2020 WL 6049912, at *5 (quoting 28 U.S.C. § 994(t)). Consequently, the defendant's efforts at rehabilitation do not outweigh the seriousness of his crime, his extensive criminal history, and his recent serious disciplinary conduct. *See, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 n.7 ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to tip the scales in his favor based on the consideration of the record as a whole."); *Hill*, 2020 WL 6049912, at *5 ("While Hill's participation in an extensive number of educational and vocational programs [was] commendable," these measures did "not warrant his early release in

light of the seriousness of his convictions and the time remaining on his sentence."). Further, defendant's rehabilitation efforts do not outweigh defendant's disciplinary record, which includes three assaults, disruptive conduct – greatest, and engaging in sexual acts, as recently as February 26, 2021. *See* Exhibit 2. Defendant's disciplinary record demonstrates that the sentence he has served so far has not deterred him from criminal conduct or promoted any respect for the law.

Courts in this district have required the defendant to bear the burden of proving that his release plan will not pose a danger to the public. *See, e.g.*, *Miller*, 2020 WL 4547809, at *6 (finding that the defendant had "not done enough to establish that he [would] not be a danger to society if released" based on his "criminal history, BOP records, and seeming inability to follow court orders, combined with the fact that his proposed release plan [did] not include any plan for ensuring that he [would] follow such orders and rules if granted release"); *Beahm*, 2020 WL 4514590, at *3 ("As the party seeking relief and with no statutory guidance otherwise, Defendant bears the burden to prove that he is entitled to compassionate release."). If released, the defendant proposes to live with his mother in Richmond, Virginia. The defendant's plan does not adequately protect against recidivism because he would be living in the same basic area where he committed the underlying offense. *See, e.g.*, *Reid*, 2020 WL 7318266, at *3 (finding that the defendant "fail[ed] to establish [] how his release present[ed] a viable alternative sentence" where his plan would be to reside with his brother, who had been "arrested and incarcerated as a co-conspirator in the underlying offense conduct, and continued the drug-trafficking conspiracy" after the defendant's arrest); *Holloman v. United States*, No. 4:14-CR-68, 2020 WL 5913995, at *3 (E.D. Va. Oct. 6, 2020) (expressing concern that defendant's "release plan does not adequately protect the public" where his plan "would have him return to his

parents' home—the same location in which the initial offense occurred"); *Coleman v. United States*, 465 F. Supp. 3d 543, 550 (E.D. Va. 2020) (determining that the defendant's "release plan [did] not adequately protect the public from the potential of a subsequent offense involving child pornography" because the defendant committed the underlying offense "while in the presence of family members, usually waiting until they went to sleep to view illicit images"). Further, the defendant has not proposed a viable plan for his continued supervision if released. *See, e.g.*, *Turner v. United States*, No. 2:18-cr-128, 2020 WL 4370124, at *3 (E.D. Va. July 30, 2020) ("Under the circumstances, a generalized recitation of supervision conditions for sex offenders is no substitute for a release plan that proactively addresses the risk of a subsequent offense."); *Coleman*, 465 F. Supp. 3d at 550 (denying compassionate release where the court had no "confidence" that the defendant's "release plan [would be] conducive to appropriate conditions of supervision and would provide the community with adequate protection against the potential for a subsequent offense."). Defendant's recent disciplinary violations demonstrate that he is not prepared to follow the rules. Indeed, he lost over 60 days of good conduct credit and was redesignated as a "high security" inmate because of his disciplinary infractions that occurred just over the last several months.

For all of these reasons, the Court should deny the defendant's motion for compassionate release based on the Section 3553(a) factors.

## VI.   Compassionate Release Should Not be Granted to This Defendant Based on his Career Offender Status

Finally, defendant argues that this Court should grant him compassionate release because if sentenced today, defendant would not be a career offender. The Court should deny compassionate release on this Ground as well.

First, defendant is attempting to relitigate his 2255 claims, which this Court considered and denied. ECF Nos. 163, 164. In his 2255, defendant challenged his guideline sentence as a Career Offender following the Supreme Court's holding in *Johnson v. United States,* 135 S.Ct. 2551 (2015). As this Court held, a *Johnson* vagueness challenge does not apply to the residual clause in U.S.S.G. § 4B1.2(a)(2). ECF No. 163, *citing United States v. Lee,* 855 F.3d 244, 246-47 (4th Cir. 2017). Furthermore, defendant is seeking to retroactively apply a Fourth Circuit case that held that a drug trafficking conspiracy conviction is not a "drug trafficking crime" under U.S.S.G. § 4B1.2, in spite of the guideline commentary (U.S.S.G. § 4B1.2, N.1) specifically stating that it does. *See United States v. Norman*, 935 F.3d 232, 237 (4th Cir. 2019). There is no authority for the retroactive application of *Norman* in a Compassionate Release motion.

Furthermore, by making this argument, defendant is in essence attempting to avoid the plea agreement he reached with the government. Defendant and the government negotiated a plea agreement that did not require the defendant to plead to the highest readily provable offense exactly because of defendant's career offender status at the time of defendant's plea and sentencing. Indeed, as defendant's own Statement of Facts evidences, the government's evidence was that the defendant distributed more than 28 grams of cocaine base to a police cooperator and possessed more than 28 grams of cocaine base along with a firearm. ECF No. 184 at ¶ 39. That evidence would have supported two drug charges that both carried a minimum mandatory term of imprisonment of 5 years and a maximum of 40 years. Additionally, the evidence would have supported a Section 924(c) conviction, which would have carried a minimum mandatory consecutive sentence of 5 years and up to life imprisonment. As a Career Offender, defendant would have been facing an advisory guideline range of 262 to 327 months

on a Section 924(c) conviction, even with a timely plea.  *See* U.S.S.G. § 4B1.1(c)(3).  Given the

plea agreement that the defendant and the government negotiated, defendant was facing an

advisory guideline range of 151 to 188 months.  Suffice it to say, the government would not have

negotiated a plea to the conspiracy charge if the law at the time of the plea was that a drug

trafficking conspiracy conviction was not a predicate offense for Career Offender purposes.

Given the controlled buys from the defendant, the government would have negotiated a plea to a

substantive offense, perhaps even one that carried a minimum mandatory term of imprisonment,

and a higher Career Offender guideline range.

With regard to defendant's challenge of the defendant's predicate crime of discharging a

firearm in public, the sentencing court knew that defendant's conviction was actually for the

felony of willfully discharging a firearm in public resulting in bodily injury.  It was not, as

defendant argues, accidental.  The sentencing court considered the argument that defendant again

now raises and rejected it.  ECF Nos. 68, 80.

Finally, because the guidelines are advisory only, the sentencing court could have varied

downward, below the Career Offender guidelines had the Court felt that a sentence of 151

months was greater than necessary to achieve the goals of sentencing.  Indeed, that is what the

Court did in the case of Andrew Grant, who also was a Career Offender (*US v. Grant,* No. 3:15-

cr-71, (EDVA 2015), at ECF Nos. 19, 24).  In comparing his case with Grant's case, defendant

fails to acknowledge that Grant was actually supplied by the defendant and was a much lower

level distributor.  *Id.,* 3:15-cr-71, ECF No. 15.  Thus, the same sentencing judge, who was

familiar with both the defendant and Grant, recognized that there was a distinction between the

two defendants and found that the appropriate sentence for this defendant was 151 months and

the appropriate sentence for Grant was 120 months.  Thus, defendant's argument now that he

should receive the same sentence as Grant has already been rejected based on the 3553(a) factors.

For these reasons as well, the Court should deny defendant's motion.

**Conclusion**

For all of the above stated reasons, the Court should deny the defendant's motion for compassionate release.  In the alternative, if the Court determines that the defendant is entitled to compassionate release, the Court should require the defendant to complete a 14-day quarantine controlled by BOP prior to his release.

Respectfully Submitted

Raj Parekh
Acting United States Attorney

_____//s//_____
Olivia L. Norman
Assistant United States Attorney
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
(804) 819-5400
Olivia.Emerson@usdoj.gov

**Certificate of Service**

I certify that on May 28, 2021, I electronically filed the foregoing response with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

By: _____/s/_____

Olivia L. Norman
Assistant United States Attorney
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, VA 23219
Office:  (804) 819-5400
Fax:     (804) 771-2316
Email:   Olivia.Emerson@usdoj.gov